# EXHIBIT D

UNITED STATES OF AMERICA
BEFORE THE FEDERAL MEDIATION AND CONCILIATION SERVICE
ARBITRATOR KITTY GRUBB

UNITE HERE, LOCAL 737,

    Union,

and

    FMCS Case No. 1033572
    Arbitrator Kitty G. Grubb
    Hearing Held: October 4, 2016
    Lake Buena Vista, Florida

WALT DISNEY PARKS AND
RESORTS U.S.,

    Employer.

_____/

## WALT DISNEY PARKS AND RESORTS U.S.'S
## POST-ARBITRATION BRIEF

### I. ISSUE

Did the Company violate the Parties' Collective Bargaining Agreement (Addendum B-1) by failing to pay an eighteen percent gratuity on "miscellaneous pricing, including but not limited to... house charges, imaging, etc." at Cinderella's Royal Table? If so, what is the appropriate remedy, if any?

### II. SUMMARY OF THE ARGUMENT

This is a textbook contract interpretation case in which the contract language is so plain, and so clear, that there is no reason for the Arbitrator to go beyond the four corners of the contract. The unambiguous contract language at issue was negotiated into the Parties' contract in 2007, and remained unchanged in the 2010 contract, as well as in the current 2014 contract. The contract language, found at Addendum B-1, clearly provides that servers at Cinderella's Royal Table ("CRT") receive gratuities on *only* three items: (1) food; (2) beverage; and (3) merchandise required to be hand delivered to the guests (i.e., wands, swords, and wishing stars).

1

(J Ex. 1 at 61-62.) The contract language is equally clear that miscellaneous pricing is expressly excluded from server gratuities, including but not limited to merchandise, house charges, imaging, etc. *Id.* Until the instant grievance, the Parties have operated without issue with a clear and unambiguous understanding regarding the meaning and intent of this language.

In support of its grievance filed on or about September 1, 2015, the Union made two arguments. First, the Union argued that since the Company changed one minor aspect of the way it does "imaging" (i.e., no longer providing an 8 X 10 glossy picture in a folder), the cost of imaging should be eliminated altogether and the imagining charge should be included with the cost of food and beverage, making it available for inclusion in the calculation of gratuities. Second, the Union argued (for the first time at arbitration) that the Company's minor change to the one aspect of the "imaging" cost violated a settlement agreement entered into by the Parties in 2007. Both arguments are wholly without merit, and even the testimony of the Union's witnesses support this conclusion.

The Union's grievance is a clear attempt to obtain through arbitration, what it failed to get (or even try to get) during contract negotiations over the last nine years and three contracts. If the Union just wants a "bigger piece of the pie", as admitted to by the Union's primary witness, it must get it at the bargaining table. To grant the Union's grievance would require the Arbitrator to rewrite the negotiated contract terms, which the contract expressly prohibits. For these reasons, the Company respectfully requests that the Union's grievance be denied.

## III. EXHIBITS[1]

| | |
|---|---|
| Joint Exhibit No. 1 | Collective Bargaining Agreement between the Company and the Service Trades Council Union (Regular Full Time - March 30, 2014, through September 21, 2019) |
| Joint Exhibit No. 2 | Service Trades Council Union/Employee Grievance Report (Grievance #1068870) dated September 1, 2015 |
| Composite Joint Exhibit No. 3 | A. Collective Bargaining Agreement between the Company and the Service Trades Council Union (Full time - May 2, 2004, through April 28, 2007); B. Collective Bargaining Agreement between the Company and the Service Trades Council Union (Full Time - April 29, 2007 through October 2, 2010); C. Collective Bargaining Agreement between the Company and the Service Trades Council Union (Full Time - October 3, 2010 through March 2014); D. Collective Bargaining Agreement between the Company and the Service Trades Council Union (Casual Regular - October 3, 2010 through March 29, 2014) |
| Union Exhibit No. 1 | Union Grievance Letter dated August 9, 2006 with Settlement Agreement dated May 2007, attached |
| Union Exhibit No. 2 | Seating Charts of Character Dining Restaurants |
| Union Exhibit No. 3 | Merchandise from Cinderella's Royal Table (sword and wand) |
| Union Exhibit No. 4 | Sample Menus from Cinderella's Royal Table |
| Union Exhibit No. 5 | Cinderella's Royal Table Dinner Checks |
| Union Exhibit No. 6a | Cinderella's Royal Table Revenue Allocation |
| Union Exhibit No. 6b | Cinderella's Royal Table Revenue Allocation Charts comparing 2007 and 2016 |

## IV. WITNESSES

### A. The Union's Witnesses

1. Wallace Kesler, Cast Member, Spirit of Aloha, Polynesian Resort

---

[1] Exhibits will be referred to as follows: Joint Exhibits- "J. Ex."; Union Exhibits – "U. Ex."; and Company Exhibits – "C. Ex.". As set forth in more detail, all seven of the Union's exhibits are wholly irrelevant to the issue being considered by the Arbitrator, and therefore, should be afforded little weight, if any.

3

      2.      Shelly Patton, Cast Member, Cinderella's Royal Table, Magic Kingdom

      3.      Richard Siwica, Union Attorney

      4.      Tara Jordan, Cast Member, Cinderella's Royal Table, Magic Kingdom

**B.   The Company's Witness**

      5.      Christie Sutherland, Director of Labor Relations, Walt Disney World

**V.   <u>RELEVANT CONTRACTUAL PROVISIONS – Joint Exhibit 1</u>**

### Article 5 – Management Rights

Except as expressly and clearly limited by the terms of this Agreement, the Company reserves and retains exclusively all of its normal and inherent rights with respect to Management of the business, including but not limited to, its right to select and direct the number of employees assigned to any particular classification of work; to subcontract work, to establish and change work schedules and assignments; to lay off, terminate or otherwise release employees from duty for lack of work or other just cause; to make and enforce rules for personal grooming, and the maintenance of discipline; to discontinue conduct of its business or operations in whole or part; to institute technological changes, including but not limited to, work automation processes and otherwise to take such measures as Management may determine to be necessary to the orderly, efficient and economical operation of the business.

### Addendum B-I – Gratuities and Fees:

Gratuities will be paid on food and beverage totals only. Gratuities will not be paid on miscellaneous pricing, including but not limited to merchandise, entertainment, (excluding Spirit of Aloha, Hoop-Dee-Doo, and Character Dining

4

restaurants, where entertainment is included in the price), house charges, imaging, etc." Merchandise will only be included in the total food and beverage price for the purpose of gratuity calculation if the Server is required by the Company to handle and deliver merchandise items to the guest as part of the Guest's dining experience. Gratuities will not be paid on autograph books, pens and disposable cameras.

## VI. MATERIAL FACTS, ARGUMENT, AND INCORPORATED MEMORANDUM OF LAW

### A. History of the Addendum B-1 Language

In the March 2, 2004, to April 28, 2007 collective bargaining agreement, between the Company and the Service Trades Council Union, of which UNITE HERE Local 737 is an affiliate, the contract language at issue simply stated that an 18% service charge would be automatically added to guests' checks and calculated on the food and beverage totals. (Composite J Ex 3A.) The language was unchanged but was further clarified in 2007 with the addition of "Gratuities will not be paid on miscellaneous pricing, including but not limited to merchandise, entertainment, (excluding Spirit of Aloha, Hoop-Dee-Doo, and Character Dining restaurants, where entertainment is included in the price), house charges, imaging, etc. Merchandise will only be included in the total food and beverage price for the purpose of gratuity calculation if the Server is required by the Company to handle and deliver merchandise items to the guest as part of the Guest's dining experience. Gratuities will not be paid on autograph books, pens and disposable cameras." (J Ex 1 and Composite J Exs 3B and 3C.)

Although not directly relevant, but applicable from a historical perspective, in or about August of 2006, the Union filed two grievances against the Company, one on behalf of servers at

5

Cinderella's Royal Table, and the other on behalf of unrelated dinner show servers[2]. (U Ex 1.) The grievance filed by the Union concerning CRT was the result of a change the Company made on February 1, 2006, from an a la carte menu to an all-inclusive dining experience. As a result of the change, the Union's grievance sought to have an 18% gratuity calculated on the total dining cost, as opposed to just food and beverage only.

In an effort to finalize contract negotiations (April 29, 2007 – October 2, 2010 contract) and resolve the two grievances simultaneously, the Parties entered into a settlement agreement on May 10-11, 2007. (U Ex 1.) Paragraph 2 of the settlement agreement is the only paragraph of the agreement that relates to servers at CRT. It provides that the 18% gratuity would continue to be calculated on food and beverage only, and added that the servers would be required to handle and deliver merchandise (swords, wands, wishing stars) to each guest as part of the experience, and the cost of that merchandise would be included in the food and beverage totals for purposes of calculating the gratuity. The language also provided that "[n]o automatic gratuity [would] be applied to the Imaging portion of the meal." (*Id.*) The settlement agreement contains language that prevents the Parties from "disclos[ing], publish[ing], or otherwise reveal[ing] the amount" contained in the settlement agreement, and it also contains language that provides that the settlement is "without precedent or prejudice and may not be utilized in any form as an interpretation of Company policy or the Collective Bargaining Agreement."[3] (*Id.*)

---

[2] During the arbitration, the Union tried to confuse the issue by suggesting that Paragraphs 3-4 of the settlement agreement were relevant to the instant grievance. Paragraphs 3-4 relate to a separate grievance involving dinner shows only with unique pricing options, including house fees (i.e., Hoop Dee Doo Review and Spirit of Aloha); Cinderella's Royal Table *is not* a dinner show.

[3] Although the settlement agreement language supports the Company's position, the Union should not have entered the settlement agreement as evidence, nor can or should it be used to interpret the collective bargaining agreement. (U. Ex. 1 at ¶ 1 and page 2.)

6

Contemporaneous with the execution of the settlement agreement, the Parties negotiated, agreed upon, and finalized the contract language contained in Addendum B-1, which was incorporated into the Parties' April 29, 2007, to October 2, 2010 contract. (Composite J Ex 3B.) The agreed upon language did not change in the October 3, 2010, to March 29, 2014 contract, nor did it change in the current March 30, 2014 to September 21, 2019 contract. (*See* J Exs 1 and 3C.)

The contract language, which is wholly consistent with the applicable Paragraph 2 of the settlement language, provides as follows:

> . . . Gratuities will be paid on food and beverage totals only. Gratuities will not be paid on miscellaneous pricing, including but not limited to merchandise, entertainment, (excluding Spirit of Aloha, Hoop-Dee-Doo, and Character Dining restaurants, where entertainment is included in the price), house charges, imaging, etc. Merchandise will only be included in the total food and beverage price for the purpose of gratuity calculation if the Server is required by the Company to handle and deliver merchandise items to the guest as part of the Guest's dining experience. Gratuities will not be paid on autograph books, pens and disposable cameras.

(J Ex. 1 at 61-62.) This contract language clearly and unambiguously provides that servers at Cinderella's Royal Table receive gratuities on *only* three items: (1) food; (2) beverage; and (3) merchandise required to be hand delivered to the guests (i.e., wands, swords, and wishing stars). The contract language is equally clear that miscellaneous pricing is expressly excluded from server gratuities, "including but not limited to merchandise, entertainment, . . . house charges, *imaging*, etc." (*Id.*) Importantly, all three of the Union's witnesses testified that the language was clear as to what was included in their gratuities, and they were equally clear as to what was not included in their gratuities. Testimony from all three of the Union's three witnesses supports the Company's position that the contract language is clear and unambiguous in its meaning and intent. Since the clarity of the language is undisputed, the grievance must be dismissed.

7

### B. The Union Asserted Two Meritless Reasons To Support Its Belief that the Company Violated the Contract.

#### 1. The Union argued that since the Company changed one minor aspect of the way it does "imaging" (i.e., no longer providing an 8 X 10 glossy picture in a folder), the cost of imaging should be eliminated altogether and included in the cost of food and beverage.

In her grievance dated September 1, 2015, Tara Jordan, one of the Union's witnesses, alleges that "servers are not paid 18% gratuity on food and beverage total. Money is taken out for imaging fee. No imaging is taking place." (J Ex. 2.) Despite the allegation in the grievance, during the hearing, all three of the Union's witnesses agreed that the contract language at issue provides only three instances in which servers at Cinderella's Royal Table get gratuities: (1) on food; (2) on beverage; and (3) on merchandise when the server is required to handle and deliver it as part of the guests' dining experience. All three of the Union's witnesses also agreed that, according to the clear contract language, miscellaneous pricing was excluded from their gratuities, which included, but was not limited to, merchandise, , house charges, imaging, etc. Their testimony was consistent and supportive of the Company's position.

The Union argued that because the Company changed the way it did imaging on January 1, 2015 (in that they were no longer providing an 8 x 10 glossy picture and folder), the Company should no longer be able to allocate a portion of the dining ticket price to "imaging." Not surprisingly, the Union argues that the amount allocated for "imaging" should be repurposed and included in food and beverage totals so that their overall gratuities increase as well. When asked to provide a basis for its belief, Ms. Shelly Patton, the Union's primary witnesses, testified simply that the servers "wanted a bigger piece of the pie." The Union's argument is without factual or legal merit.

Ms. Christie Sutherland, the Company's only witness, testified that despite the Union's suggestions to the contrary, the Company still very much had imaging costs and expenses associated with the guest dining experience at CRT. Ms. Sutherland explained that guest preference has changed over the years from images produced through hardcopy photo paper to a desire to own digital copies and copyrights to images for ease of use for holiday cards, social media, etc. Ms. Sutherland testified that the Company has invested a significant amount of resources developing, supporting, and maintaining its digital photography department to further enhance the guest experience, including the guest dining experience at CRT. Ms. Sutherland explained that guests who pay for dining at CRT get an exclusive and private imaging experience with Cinderella, and the opportunity to have pictures taken with her in the royal castle. In fact, Union witness, Ms. Patton, even admitted that it was an exclusive imaging experience because guests cannot have their pictures taken with Cinderella in the royal castle without purchasing a dining ticket for CRT.

Ms. Sutherland testified unequivocally that imaging, which still absolutely exists at CRT as part of the guest experience, was negotiated and expressly excluded from server gratuities. Ms. Sutherland testified that the Parties have operated with a clear understanding of the meaning and intent of this language for nine years. In addition, Ms. Sutherland testified that even if the Company eliminated the imaging experience at CRT (which it has not), the contract language gave the Company wide discretion and latitude to allocate the amount for imaging to any other miscellaneous pricing item it so desired (including "Sunny Day Charges") – any form of which would be contractually excluded from the calculation of server gratuities at CRT.

Ms. Patton's testimony during the arbitration not only compels the denial of the Union's grievance, but entirely supports the Company's theory of the case. Ms. Patton admitted that the

Company has an absolute management right to set all dining pricing and that the Union is never included nor involved in the pricing process. Ms. Patton admitted that the Company could increase the dining cost, or decrease the dining cost, and the Union had no say in that decision or process. Ms. Patton admitted that the Company has an absolute right to make money and be profitable and further that she hoped it did because she was a large stockholder. Ms. Patton admitted that the Company has increased the dining costs over the years and that the servers at CRT have directly benefitted from increased gratuities as a result of those price increases. Ms. Patton admitted that the servers at CRT did not lose any money as a result of the change to the Company's imaging process on January 1, 2015, and that they continued to receive gratuities on food, beverage, and merchandise they were required to handle and deliver, and that the gratuities had not decreased as a result of the change on January 1, 2015. Ms. Patton admitted that the Parties contract language gave the Company wide discretion and latitude to place any type of miscellaneous pricing to the cost of the dining ticket it wanted, including an "etc." allocation and a hypothetical "Sunny Day Charge" allocation if the Company so desired. Although the Union testified that they "think" they should be entitled to receive the imaging portion of the dinner ticket price, the Union's perception is negated by the reality of the contract language.

> 2. **The Union argued (for the first time at arbitration) that the Company's minor change to the one aspect of the "imaging" cost somehow violated a settlement agreement entered into by the Parties in 2007. Both arguments are wholly without merit, and the testimony of the Union's own witnesses confirm it.**

During the grievance process, the Union never raised or even suggested that the Company violated the terms of a 2007 settlement agreement, which resolved two unrelated grievances, as support for its grievance. This argument was made by the Union for the first time

during arbitration. The Union's argument, which was certainly made to cloud the lack of merit of its grievance, is flawed for multiple reasons.

First, if the Union truly believed that the Company violated the terms of the 2007 settlement agreement (which has never been suggested in nine years), the grievance and arbitration process is not the proper forum for such a claim. If the Union thought the Company violated the 2007 settlement agreement, it should have filed a breach of contract claim in state court, or even an unfair labor practice with the NLRB. The Union did neither.

Second, to support its contention that the 2007 settlement agreement was somehow violated, the Union surprisingly called Wallace Kesler (a server at Spirit of Aloha restaurant) who testified about the application of house charges (related to seat location) on dining ticket prices. Mr. Kesler confirmed he has never worked at CRT. Mr. Kesler's testimony regarding house fees as utilized at Spirit of Aloha should be completely discounted by the Arbitrator since the Spirit of Aloha is a "dinner show", and CRT is not. Since Spirit of Aloha is a dinner show restaurant, it is governed by different paragraphs of the 2007 settlement (specifically, Paragraphs 3-4). As such, the application of gratuities of dinner show ticket pricing is completely different (an apples to oranges comparison) than the application on gratuities at CRT. Mr. Kesler admitted to this fact during his testimony, and further admitted that the contract language was clear that the calculation of gratuities at dinner shows was entirely different than all others restaurants (including CRT).

Third, the Union never pointed to the specific section of the 2007 settlement that they believed the Company breached. The only arguably related evidence presented by the Union was testimony by Ms. Patton who indicated that she allegedly spoke to a former Company executive who told her the Company would never change dinner pricing without discussing it

11

first with the Union. Ms. Patton, an admitted seasoned and professional bargaining representative, conceded that the alleged agreement was never negotiated into the plain language of the contract (nor has it changed in the last three contracts), and further admitted that she has no documents that confirmed the alleged discussion (no e-mails, no letters, no memorandum, etc.). Ms. Patton simply stated that she "wished she had written it down." This hearsay "evidence" must be rejected and is certainly insufficient to support the Union's claim.

### C. As Explained Above, The Union Has Failed to Meet Its Heavy Burden of Proving the Company Violated The Contract.

The Union has failed to meet its heavy burden of proof required in a contract interpretation case. The Union has the burden of proof to establish by a preponderance of the evidence that its interpretation is, in fact, the correct one and that the Company violated the collective bargaining agreement. 2009 AAA LEXIS 25, 41 (Massey, January 4, 2009); 2008 AAA LEXIS 640, * 12 (Murphy, June 18, 2007); 2005 AAA LEXIS 319, *18 9 (Hayford, April 11, 2005). The Union, through its counsel, presented testimony through three witnesses. Here, even if the Arbitrator accepts the testimony of the Union's witnesses, the Union has absolutely and unquestionably failed to present any evidence to satisfy its burden of proof. In fact, the Union presented no other possible interpretation of Addendum B-1; the Union's three witnesses confirmed the meaning and intent of the language and supported the Company's entire theory of the case.

Instead of presenting evidence that the Company violated the terms of the collective bargaining agreement, the Union has simply asked the Arbitrator to rewrite the collective bargaining agreement so that the servers can be given a greater gratuity (i.e., "a bigger piece of the pie"). However, the bargaining agreement prohibits the Arbitrator from rewriting the terms

of the collective bargaining agreement. (J Ex. 1 at 30.) As such, the Union's grievance must be denied.

### D. The Plain Meaning Rule Governs the Analysis of Addendum B-1

In this contract interpretation case, the "plain meaning rule" governs the analysis of this dispute. The plain meaning rule provides that if the words in the collective bargaining agreement are "plain and clear, conveying a distinct idea, there is *no occasion to resort to interpretation* and the meaning is to be derived entirely from the nature of the language used." *In re Smart Paper Holdings, L.L.C.*, 126 LA 605, 606 (Van Kalker, March 13, 2009). Traditional labor arbitration doctrine requires arbitrators to enforce "the plain meaning of the contract the parties negotiated." *Kansas City Fire Dept.*, 126 LA 609, 611 (Berger, May 4, 2009). In addition, "[i]f the disputed Contract language is clear and unambiguous, the Arbitrator will give such language its plain meaning." *Belleville Shoe Mfg.*, 126 LA 825, 827 (Fitzsimmons, April 4, 2009).

As a threshold matter, it is undisputed that Addendum B-1 provides in pertinent part: "Gratuities will be paid on food and beverage totals only. Gratuities will not be paid on miscellaneous pricing, including but not limited to merchandise, entertainment, (excluding Spirit of Aloha, Hoop-Dee-Doo, and Character Dining restaurants, where entertainment is included in the price), house charges, imaging, etc." (J Ex. 1.) The plain meaning of this contract language provides that servers at Cinderella's Royal Table ("CRT") receive gratuities on *only* three items: (1) food; (2) beverage; and (3) merchandise required to be hand delivered to the guests (i.e., wands, swords, and wishing stars). The plain meaning of the contract language is equally clear that miscellaneous pricing is expressly excluded from server gratuities, including merchandise, entertainment, house charges, imaging, etc. This exact contract language was agreed upon by the Parties in three separate contracts since 2007. (J Ex. 1, 3A-C.) For the Arbitrator to find

otherwise would require the Arbitrator to rewrite a provision of the contract, which is simply not permitted. (J Ex. 1 at 30.)

### C. The Application of the Parol Evidence Rule

Assuming there is an ambiguity in the collective bargaining agreement language, which the Union has failed to establish and the Company disputes, the Arbitrator, in an effort to resolve the dispute, is permitted to consider parol evidence in the form of interpretive aids such as "bargaining history or past practices of the parties." *Belleville Shoe Mfg.*, 126 LA 825 (Fitzsimmons, April 9, 2009), citing *How Arbitration Works*, Elkouri & Elkouri (5th Ed. 2003). Although the "parol evidence rule" ordinarily operates to bar the introduction of extrinsic evidence to contradict or supplement the final and complete written expressions of the parties, under circumstances where the language of the agreement is unclear or ambiguous, the arbitrator is permitted to consider extrinsic evidence to aid in interpretation of the contract language. *Commercial Vehicle Group*, 125 LA 534, 539, n. 6, (Fullmer, May 29, 2008), citing *How Arbitration Works*, Elkouri & Elkouri (5th Ed. 2003). Even assuming that the Union's weak efforts at the hearing constitute a sufficient illustration of ambiguity in the language of the CBA, the Union did not offer any evidence whatsoever (such as bargaining notes, past practices, alternatives or withdrawn bargaining proposals) to establish that its interpretation of the collective bargaining agreement is actually what the parties intended. In fact, the Union's own witnesses admitted that they simply want a "bigger piece of the pie."

### D. Binding Past Practice Dictates that the Grievance be Denied

"Past practice" may establish separate, enforceable conditions of employment. *Cuyahoga Community College*, 108 LA (BNA) 268 (Klein, 1997). "We acknowledge that parties contract with reference to an existing set of practices even if they are not mentioned in the

contract...Matters not covered by the contract may be part of the 'context' of the agreement in holding major working conditions as they were." *General Aniline & Film Corp.*, 19 LA (BNA) 628 (Talbott, 1952).

A "past practice" becomes part of the labor agreement when it consists of a course of action knowingly followed by the Union and the Company over a period of time. *Midland Brick & Tile Co.*, 77 LA (BNA) 49 (Newmark, 1981). In order for a past practice to be binding as a term of a contract, it "must be (1) unequivocal; (2) clearly enunciated and acted upon; and (3) readily ascertainable over a reasonable period of time as a fixed and established practice mutually accepted by both Parties." *How Arbitration Works*, Elkouri & Elkouri, 608 (6th ed. BNA 2003); *Celanese Corp. of Am.*, 24 LA (BNA) 168 (Justin, 1954). A practice may meet the third requirement by being in effect under various labor agreements. *City of Kansas City*, 106 LA (BNA) 865 (Miller, 1996); *see Weyerhauser Co.*, 105 LA 273, 276 (Nathan, 1995) ("A 'practice' as that concept is understood in labor relations refers to a pattern of conduct which appears with such frequency that the parties understand that it is the accepted way of doing something."); *Brown-Foreman Beverage Co.*, 103 LA 292, 294 (Frockt, 1994) ("[T]he general principle is that a practice exists when a certain result has been utilized in repetitive and identical circumstances.") Another formulation requires clarity, consistency and acceptability. Clarity embraces uniformity, consistency requires repetition, and acceptability speaks to mutuality in the practice, which may be tacit - an implied mutual agreement arising by inference from the circumstances. *How Arbitration Works*, Elkouri & Elkouri, 608-09 (6th ed. BNA 2003).

The evidence is clear and undisputed – the Union has been well aware of the Company's interpretation and administration of Addendum B-1 since May of 2004 (over 12 years). This is evidenced by three collective bargaining agreements, all of which the Union has agreed to and

bargained for. It is undisputed that the Company has consistently interpreted and administered this language under the predecessor collective bargaining agreements, as well as under the existing collective bargaining agreement. The Company has not included imaging fees or house charges in the total amount of the bill for purposes of calculating a server's gratuity. For twelve years, the Company has operated in this manner regarding these fees. For twelve years, the Union has understood and operated under this language. As such, the Company's interpretation and administration of Addendum B-1 regarding imaging fees (with full knowledge of the Union), is a legally enforceable and binding contract provision of the contract, which the Company is adhering to. The Arbitrator understands that the collective bargaining agreement does not authorize the creation of contract language, nor does it authorize the formulation of remedies, where no supporting language exists. (J Ex. 1 at 30.)

## VII. CONCLUSION

Based on the foregoing, the Company respectfully requests this Arbitrator to deny the Union's grievance.

Respectfully submitted,

By: /s/ Aaron L. Zandy
Aaron L. Zandy
Florida Bar No. 0125271
FORD & HARRISON LLP
300 S. Orange Avenue, Suite 1300
Post Office Box 60
Orlando, FL 32802-0060
azandy@fordharrison.com
407.418.2300 Telephone
407.418.2327 Facsimile
Attorney for the Company

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document was furnished via email and First Class U.S. on this 20th day of January, 2017 to: Richard Siwica, Esquire, Egan, Lev & Siwica, P.A., 231 East Colonial Drive, Orlando, FL 32801 (rsiwica@eganlev.com).

*Aaron L. Zandy*
Aaron L. Zandy